UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

       Plaintiff,                             CASE NOS.   19-cr-20674-GAYLES
                                                                    25-cr-20154-GAYLES

v.

JOSE RIVERA GARCIA,

       Defendants.
_____/

## OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND REQUEST FOR DOWNWARD DEPARTURE OR VARIANCE

The Defendant, **JOSE RIVERA GARCIA** ("Mr. Rivera"), by and through his undersigned counsel, and pursuant to *U.S.S.G. §6A1.2-3*, *Rule 32 (d), (e)(2)* and *(f)*, *Fed. R. Crim. P.,* and *18 U.S.C. § 3553(a),* respectfully files his Objections to the Presentence Investigation Report (hereinafter "PSR") and Request for Downward Departure or Variance. In support thereof, Mr. Rivera states:

## INTRODUCTION

The Presentence Investigation Report (hereinafter PSI) submitted by the probation office details guidelines inconsistent with and out of proportion with the government's[1] and the Defendants' expectations as what would amount to a fair and reasonable result in anticipating the total offense level. The PSI is out of sync or proportion with similarly situated co-defendants and overrepresents the Defendant's culpability and incarceration exposure.

---

[1] Counsel has been able to speak with assistant United States Attorney Frank Tamen (19-cr-20674) but despite numerous attempts has not communicated with Department of Justice Attorney Jaqueline DerOvanisian (25-cr-20154).

Boris Arencibia was indicted in late December 2023 (the original indictment was unsealed in 2019). Approximately six months after Arencibia's indictment, a grand jury handed up the sixth superseding indictment which included Jose Rivera. Lengthy pretrial litigation was engaged in by the parties. During the course of the litigation the parties joined in negotiation in the expectation that a reasonable settlement could be found. During those discussions it was discovered that the government had a pending investigation, and a potential indictment was in the offing which would have resulted in additional charges directed toward both Defendants. The discussion accelerated and the government and the Defendants sought a resolution encompassing both matters. Eventually, the Defendants agreed to enter into an agreement with the government, and a change of plea was had. These discussions yielded an agreement with the Guideline level of 22 (41-51 months) for Mr. Rivera in Case No. 19-cr-20674 and a level of 23 or 25 (46-57 months or 57-71 months based upon a determination of the applicability of the sophisticated means enhancement) in Case No. 25-cr-20154. However, Rivera's PSI found a total offense level of 36 with a range of 188-235 months. Neither the Defendant nor the government contemplated an offense level of such magnitude. The offense level is primarily skewed by the grouping found by the probation officer, and the allegation that the "…the defendant was employed by, or was an agent of, an organization in the supply chain for the pre-retail medical product…" (see paragraph 235 of Rivera's PSI), and the probation office's finding that Mr. Rivera was an organizer or supervisor.. Neither of the parties, that is, the government, nor the Defendant, contemplated such a result. The resultant finding by the probation office represents a distorted total offense level and is an unfair and disparate representation and, perhaps, more importantly, incongruent with the parties' expectations and beliefs at the time of the consummation of the agreements. "A sentence imposed pursuant to a plea agreement must follow the reasonable understandings and expectations of the defendant

with respect to the bargained-for sentence." *United States v. Palladino*, 347 F.3d 29, 33 (2d Cir.2003) (internal quotation marks omitted).

## RIVERA'S PLEA AGREEMENTS

**Case No. 19-cr-20674**: In this Plea Agreement Jose Rivera entered a plea of guilty to Count 3 of the Superseding Indictment which charged him with money laundering conspiracy, in violation of 18 U.S.C. § 1956 (h). The parties agreed to recommend a loss amount of $7.3 million and no adjustment for sophisticated laundering and no role adjustment would be applied. The Defendant's acceptance would result in a reduction of three levels. And, finally, a recommendation that his sentence would be concurrent with the other case. Based upon this agreement Mr. Rivera would have a guideline level of 22.

**Case No. 25-cr-20154**: Here, the Defendant entered a plea of guilty to Count 1 of the Information charging the Defendant with conspiracy to traffic in medical products with false documentation, in violation of 18 U.S.C. § 670(c)(2). Within the Plea Agreement the parties agreed to the following recommendations: a base offense level of **6** and a loss amount of more than $9.5 million and not more than $25,000,000 which increased the offense level to 20; an offense level increase of 2 levels as the crime involved conduct described in 18 U.S.C. § 670; the sophisticated means enhancement of two levels would be decided by the court after hearing argument by the parties; the parties would recommend that the Defendant would receive a 2 level reduction as a zero-point offender; and, finally, a three level reduction for acceptance of responsibility. Based upon this agreement Mr. Rivera would have a guideline level of 25 or 23 (depending upon the court's finding regarding sophisticated means) and would yield a total offense level of 25 or 23, again, depending upon the sophisticated means determination by the court.

Finally, the government would recommend the court sentence the Defendant to the low end of the guidelines.

The PSI's calculated offense level of 36 (188 to 235 months) is fundamentally flawed and represents an extreme departure from the Parties' negotiated plea agreements. Again, the Parties' Agreements contemplated a total offense level of 22 in Case No. 19-cr-20674 ("2019 case") and a total offense level of 23 or 25 in Case No. 25-cr-20154 ("2025 case")—a difference of over ten (10) levels. This disparity violates due process, fundamental fairness principles, and the careful negotiations that led to Mr. Rivera acquiescence to the agreements. Mr. Rivera respectfully requests the Court either honor the negotiated agreements or, alternatively, impose a significant variance under 18 U.S.C. § 3553(a) to achieve a sentence—sufficient but not greater than necessary.

Mr. Rivera was indicted in two related cases, Case No. 19-cr-20674 ("2019 case") and Case No. 25-cr-20154 ("2025 case"). He accepted plea agreements in both cases and is being sentenced on both matters in this proceeding. The Plea Agreements represent the culmination of extensive, good-faith negotiations between the Government attorneys in both cases, the undersigned counsel, and co-defendant Boris Arencibia's counsel. Throughout these negotiations, all parties—including Government supervisors who reviewed and approved the final agreements—carefully weighed the factors enumerated in 18 U.S.C. § 3553(a)(2), including the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. The Government's willingness to recommend these specific sentences, after thorough investigation and consideration of Mr. Rivera's personal history, circumstances, and the nature of the offenses, demonstrates prosecutorial recognition that the agreed-upon terms are "sufficient, but not greater than necessary"

to accomplish the statutory sentencing purposes. Probation's calculation, which exceeds the negotiated terms by more than ten (10) offense levels, fails to account for this collaborative process and the reasoned judgment of experienced prosecutors who are intimately familiar with both the facts of these cases and the appropriate punishment necessary to satisfy the goals of sentencing.

Despite the Parties' plea agreements that calculated Mr. Rivera's total offense level at 22 in the 2019 case, and 23 or 25 in the 2025 case, depending on whether sophisticated means and/or role enhancement are assessed, the PSI finds Mr. Rivera's total offense level at 36.

Significantly, the Government recognized the distinctions among the various codefendants and coconspirators were a matter of "function, as a division of labor in a partnership." Paragraphs 218 and 219 of the PSI outline the roles of the participants/co-conspirators, while, these paragraphs correspond with the 19-cr-20674 case, the description provided apply equally to Case 25-cr-20154.

## BACKGROUND

Mr. Rivera was arrested on June 11, 2024, in Case No. 19-cr-20674 and has remained at liberty (subject to bond conditions) since. While the cases bear different docket numbers and involve different time periods, the evidence establishes they are part of a single, continuous conspiracy involving the diversion of prescription drugs and related money laundering activities. Both cases involve the same essential criminal scheme—the diversion of prescription drugs within the United States, including Puerto Rico, Arizona, and Florida. The conspiracy employed the same modus operandi, involved overlapping coconspirators, and pursued identical objectives across both time periods. The Government itself has characterized these as extensions of the same underlying conspiracy, with the 2025 case representing a continuation of the criminal activity that began in 2013.

**Case No. 19-cr-20674** encompasses conspiracy activity from approximately 2013 through May 29, 2019, and involved approximately twenty (20) conspirators, many who were indicted as early as 2019 and whose cases have been resolved. Mr. Rivera was the last individual indicted (shortly before the statute of limitations expired) and pleaded guilty to Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h) (Count 3).

Based upon the plea agreement entered with the Government, Mr. Rivera's total offense level pursuant to the Federal Sentencing Guidelines (USSG) is 22. The parties agreed that no adjustments for sophisticated laundering, obstruction, or role adjustment are warranted.[2] The Parties agreed to recommend that the sentences in the 2019 and the 2025 case be run concurrently.

**Case No. 25-cr-20154 involves** the continuation of the conspiracy from March 2022 and continuing through December 2023, and involves a codefendant, Mr. Arencibia, at least three (3) coconspirators, and several unindicted coconspirators. Mr. Rivera pleaded guilty to Conspiracy to Traffic in Medical Products with False Documentation in violation of 18 U.S.C. §670(a)(2) (Count 1). Codefendant, Mr. Arencibia, will be sentenced contemporaneously with Mr. Rivera.

Mr. Rivera's total offense level ranges from 23 to 25 under the plea agreement.

**Related Cases**: *United States v. Orel Valdespino Fernandez,* Case No. 24-cr-20045-Altman. Defendant plead to one count of money laundering and was sentenced to 33 months.[3] The defendants in *United States v. Alex Oria,* Case No. 24-cr-20108-Moore and *United States v. Diosdan Gonzalez Alvarado*, Case No. 24-cr-20254-Moore, also plead guilty. Defendant Gonzalez is scheduled for sentencing on November 20, 2025, and defendant Alvardo on October 2, 2025.

---

[2] The PSI acknowledges "the defendants in this conspiracy were not involved in sophisticated laundering nor was sophisticated means involved in this case and the two-level adjustments...were not imposed." PSI at paragraph 151.

[3] Interestingly, co-conspirator Valdespino's "loss amount" was calculated at $7.2 million rather than the Defendant's $21 million+.

**The PSI Guidelines Calculations:** The PSI recommended total offense level is over ten (10) levels above the total offense levels anticipated by the Parties. In part because probation grouped the cases under §3D1.1(d) and in part because of Probation's recommended enhancements.

- *Base Level*   To start, while the Government in both cases started with a base offense level *6*, the PSI assessed a base level *7*. Resulting in **+1** level greater than the Parties anticipated.

- *Specific Offense Characteristic*   As a result of grouping the cases, the loss amount increased from $7.3 million in the 2019 case and $21,540,489 in the 2025 case, to an aggregate of $28,840,489, resulting in an increase of **+4** levels to the 2019 case and **+2** levels to the 2025 case.

- *Employee/Agent of an organization in the supply chain for the pre-retail medical product*  Probation also assessed four additional levels under USSG 2B1.1(b)(8), claiming, despite there being no evidence to support such a finding, that Mr. Rivera was employed by or was an agent of an organization in the supply chain for the pre-retail medical product. Although Mr. Rivera supplied diverted drugs *to* such companies, he did not participate in the operations of any of those they supplied the drugs to nor was he employed *by* any of them.  As the Government recommends, Mr. Rivera "should receive a two-level increase under USSG §2 B1.1(b)(8) instead of the four-level increase in the PSI." *Id.* Thus, the PSI assessed an additional +**2** levels against Mr. Rivera above what is proper and what the Parties agreed to in the plea agreements.

- *Sophisticated Means:* The PSI assessed an additional **+2** levels on the grounds that the offense involved sophisticated means. As is more fully developed below, Mr. Rivera's conduct in the offense did not involve sophisticated means (as acknowledged in the 2019 case).

- *Role Enhancement:* The PSI also assessed an additional **+2** levels for Mr. Rivera's role in the conspiracy without any factual support to determine that Mr. Rivera was in fact a manager, leader, or organizer. As more thoroughly discussed below, the coconspirators were all partners, performing the necessary aspects of their role to ensure the success of the business. Mr. Rivera was neither a manager, leader, or organizer.

- *Zero Point Offender:* If Mr. Rivera is not assessed an aggravating role, Mr. Rivera qualifies for a two (2) level decrease as a zero-point offender.

As detailed above, the PSI's calculations result in an excessive sentence that is far above what the Parties negotiated. The defendant and the government reached agreements that result in calculations of at least ten (10) levels below those recommended in the PSI. This stark disparity demonstrates that the PSI fundamentally deviates from the carefully negotiated terms between the parties. Accordingly, Mr. Rivera asks this Court to enter a sentence in line with the agreements reached between Mr. Rivera and both Government prosecutors in these cases or grant a downward variance to achieve the Parties' agreements.

**Objections to PSI Report**

*Page 2:* Mohammad Mehdi Salemi 9/18/2025: Sentence reduced to 53 months imprisonment to run concurrent, 3 years supervised release. *Case No.* 19-cr-20674-DPG [2019 Case, DE 1149].

*Page 5-Related Cases to Case No. 25-cr-20154*:

*United States v. Orel Valdespino Fernandez, Case No.* 24-cr-20045-RKA: Sentenced to 33 months imprisonment, 3 years supervised release as to Count 1, money laundering.

*Paragraph 21(b), at p. 10* has a minor typo in that the paragraph should read that defendant's offense level shall increase by twenty levels, not two, pursuant to section 2B1.1(b)(1)(K).

*Paragraph 34, at p. 13* Alex Orias plead guilty to Count 1 of the Indictment, conspiracy to introduce into interstate commerce misbranded drugs and to defraud the United States in violation of 18 U.S.C. § 371. Sentencing is set for November 20, 2025. *See United States v. Alex Oria,* 24-cr-200108-Moore.

### The Offense Conduct – Objections:

*Paragraph 112:* Mr. Rivera did not *direct* Linares to travel to Connecticut. While he may have assisted in Linares travel, it was through a mutual agreement. See Defendant's Proffer DE [1120].

*Paragraph 113:* Mr. Rivera did not *direct* Linares to contact Joles. Acting in concert, an email was jointly composed by Mr. Rivera and Linares.[4]

*Paragraph 185:* Mr. Rivera was arrested on June 11, 2024; (should be "his involvement")

*Paragraph 198:* Mr. Rivera never spoke with, or communicated with, or directed Valdespino at any time.

*Paragraph 223:* Again, Mr. Rivera never spoke with, or communicated with, or directed Valdespino at any time.

*Paragraphs 235:* Role Adjustment in Case No. 25-20154. Mr. Rivera objects to paragraph 235 in so far as it suggests that Mr. Rivera and Mr. Arencibia were the owners of Eclipse and directed Valdespino to take payments to bank branch locations to conduct transactions on behalf of Eclipse. Probation recommends a two-level role enhancement despite the complete absence of any evidence that Mr. Rivera was a manager or leader of other participants. On the contrary, the PSI describes Mr. Rivera's conduct and that of his co-conspirators as equals, with nothing in the PSI indicating Mr. Rivera is a leader or organizer.

---

[4] Paragraph 220 of the PSI acknowledges that Mr. Rivera should receive no role adjustment while paragraph 218 suggests the respective roles of the co-conspirators.

The other coconspirators in this case are: Diosdan Alvarado, Orel Valdespino, and Alex Oria. All three have also pled guilty to Money Laundering (Orel Valdespino) and Conspiracy to Introduce into Interstate Commerce Misbranded Drugs and to defraud the United States by impairing/impeding the functions of the FDA (Diosdan Alvardo and Alex Oria). Critically, nothing in their factual proffers suggests they were being controlled by any other co-conspirator, let alone, Mr. Rivera. In fact, the factual proffers describe each coconspirators' independent role in the conspiracy—each working toward the success of the business as equals. *See United States v. Diosdan Gonzalez Alvarado,* 24-cr-20254-KMM, DE [47]; *United States v. Orel Valdespino Fernandez,* 24-cr-20045-Altman, DE [48]; *United States v. Alex Oria,* 24-cr-20108-KMM, DE [77]. The PSI establishes that the coconspirators' relationship was a partnership with each participant contributing equally to the conspiracy's activities, not a hierarchical structure warranting a role enhancement.

*Paragraph 235* Grouping: The PSR erroneously groups the fraud and money laundering counts despite the fact the counts do not involve substantially the same harm as defined in guideline §3D1.2. Significantly, if these cases proceeded to separate sentencing hearings on different dates, and not together, grouping (an enhancement here) would not apply—a distinction that underscores the impropriety of combining these offenses merely because they are being sentenced simultaneously.

Grouping is appropriate only when a defendant has been convicted of counts that constitute "Groups of Closely Related Counts." *See* U.S.S.G. §3D1.1. While multiple counts from different indictments or informations may be grouped if sentences are imposed simultaneously or in a consolidated proceeding, *see United States v. Wilson*, 593 F. App'x 942 (11th Cir. 2014), the threshold question remains whether the offenses are sufficiently "closely related" to warrant grouping.

Under U.S.S.G. § 3D1.2, offenses are grouped for sentencing purposes if they involve substantially the same harm. This includes situations where the offenses involve the same victim and

the same act or transaction, or where they involve the same victim and are connected by a common criminal objective or scheme. Grouping may also be appropriate when one offense contributes a specific offense characteristic to another or when the offense level is determined based on aggregate harm.

Subsection 3D1.2(d) provides that counts involve the same harm "when the offense level is determined largely on the basis of the total amount of harm or loss, . . . or some other measure of aggregate harm[.]"  This subsection lists guideline sections representing offenses that "are to be grouped," including §2S1.1 (money laundering) and 2B1.1 (theft and fraud). However, ***the mere listing of both Guidelines does not automatically necessitate grouping***. *See United States v. Harper,* 972 F.2d 321, 322 (11th Cir. 1992) (holding that automatic grouping can detract from the purpose of section 3D1.2 "to combine offenses involving closely related counts.").

In *United States v. McClendon,* the Eleventh Circuit affirmed the district court's determination that the fraud and money laundering counts should not be grouped together for purposes of sentencing purposes.  195 F.3d 598, 603 (11th Cir. 1999). The Court found that the nature and measure of harm resulting from the two offenses differed because: there were separate victims of the two offenses; the offense level for each count was determined in a different manner under the Guidelines; and the fraud scheme was not dependent upon the money laundering. *Id.* 602; *see also Harper,* 972 F.2d at 322 (holding that money laundering and drug trafficking offenses should not be grouped where they were not of the same general type and the facts did not show the offenses to be closely related).  The Court distinguished *United States v. Mullens,* 65 F.3d 1560 (11th Cir. 1995) where grouping was affirmed because the money contributed by new investors in a Ponzi scheme was "laundered" when paid out to old investors as false profits, making the fraud and money laundering "integral cogs in continuing the scheme." McClendon, 195 F.3d at 602. The critical distinction in Mullens was "the main connection

between the laundered funds and the fraud scheme . . . [was] that the money represented the proceeds of the fraud." *Id.*

Here, as in *McClendon* and *Harper*, the fraud and money laundering counts are not closely related. First, the two conspiracies involved distinctly different victims, i.e., the United States Food and Drug Administration in the 2025 Case, *see PSR at ¶222,* and in the 2019 Case, unidentifiable patients who received drugs that may not have been of full potency, *PSR at ¶221*, and pharmaceutical manufacturers who had their pill bottles stored in poor conditions thereby affecting the efficacy of the pills. PSR at ¶219. The presence of separate and distinct victims is a dispositive factor militating against grouping. *See McClendon*, 195 F.3d at 602.

Moreover, the nature and measure of harm resulting from each offense differ fundamentally. The money laundering offense under §2S1.1 involves the processing and concealment of illicit funds, with the offense level calculated based on the value of funds laundered while the prescription drug trafficking offense under §2B1.1 involves tangible harm to public health and safety, pharmaceutical supply chain integrity, and potentially compromised medication efficacy, with the offense level calculated based on loss amount or intended loss. These offenses are measured differently under the Guidelines and produce qualitatively different harms—one financial and regulatory, the other involving public health and safety.

Unlike *Mullens*, where the money laundering was essential to perpetuating the fraud scheme, here the prescription drug trafficking conspiracy could have—and did—exist independently of any money laundering activity. The drug trafficking scheme's success did not depend on laundering the proceeds; rather, the money laundering was a separate, subsequent offense involving the disposition of funds after the drug trafficking had already occurred. The "main connection between the laundered funds and the fraud scheme" is merely "that the money represented the proceeds of the fraud"—

precisely the attenuated connection that *McClendo*n found insufficient to warrant grouping. 195 F.3d at 602.

It bears emphasizing that grouping here operates as an enhancement, not a reduction. If these cases had proceeded to separate sentencing hearings, Mr. Rivera would not face this enhancement. The artificial consolidation of sentencing should not result in a harsher penalty for conduct that, by its nature, involves separate harm, separate victims, and independent criminal schemes.

Accordingly, the fraud and money laundering counts are not "closely related" under U.S.S.G. §3D1.2. They involve different victims, produce different types of harm, are calculated under different guideline provisions, and are not integral to one another. Consistent with *McClendon* and *Harper*, the Court should decline to group these offenses and should sentence Mr. Rivera on each count separately as the Parties anticipated under the plea agreements.

**<u>Base Offense Level, Adjusted Offense Level, Total Offense Level, & Guideline Provisions</u>**

<u>Paragraph 235</u>

- <u>Grouping—Loss Amount</u>: Consistent with Mr. Rivera's grouping argument above, Mr. Rivera objects to aggregating the loss amounts for both the 2019 and the 2025 case.

  - <u>Employee or Agent of Pre-Retail Supplier:</u> Mr. Rivera objects to the four-level increase under section 2B1.1(b)(8)(B). Defendant was *not* employed by (or was an agent of) an organization in the supply chain for the pre-retail medical product. The Government agrees that Mr. Rivera should receive a two (2)-level increase (not four as recommended in the PSR) under §2B1.1(b)(8)(A) because although Mr. Rivera may have been supplying diverted drugs to pre-retail medical products organizations, he was not an employee or participating in the operation of the companies he supplied the drugs to.

Moreover, both the 2019 case and the 2025 case plea agreements provide for a two-level increase pursuant to §2B1.1(b)(8)(A), not a four-level increase as recommended in the PSI.

- *Sophisticated Means*: Congress amended § 2B1.1(b)(10)(C) in 2015 so that the specific offense characteristic for "sophisticated means" would apply only to the defendant's individual conduct in the offense and not the overall scheme; this section now centers on the defendant' actual conduct rather than on the conduct of all individuals involved in the conspiracy. The reason for the amendment was to narrow the focus of the enhancement to the sophistication of the defendant's personal conduct, not the scheme as a whole. *United States v. Presendieu*, 880 F. 3d 1228, 1248 (11th Cir. 2018).

    A sophisticated means enhancement is only applicable if the "offense otherwise involved sophisticated means *and* the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. 2B1.1(b)(10)(C) (emphasis added). Therefore, a sophisticated means enhancement is only applicable if the offense otherwise involved sophisticated means *and* the Defendant "intentionally engaged in or caused" the conduct constituting sophisticated means. *Id*. There is nothing on the record to indicate that Mr. Rivera personally involved himself or directed anyone to engage in any conduct that is especially complex or especially intricate to either execute this offense or to attempt to conceal it. There is no evidence Mr. Rivera did anything other than supply the diverted prescription drugs at varying times during the conspiracies. Notably, the Government noted as much. *Cf. United States v. Gaye,* 902 F. 3d 780, 791 (8th Cir. 2018) (affirming sophisticated means increase against the organizer of a conspiracy that lasted over eight years, involved over 500 participants and 1500 transactions. The Court found that the scheme required recruiting others to avoid detections, coordinating and planning, and a

vast network of coconspirators). Since Mr. Rivera's offense did not involve sophisticated means, the two (2) level enhancement in paragraph 235 should be rejected.

*Paragraph 238:* Role Enhancement.  Mr. Rivera objects to Paragraph 238 of the PSI, insofar as it states that Mr. Rivera was an organizer, leader, manager, or supervisor. At best, the PSI establishes that Mr. Rivera and his coconspirators were partners. Even assuming that Mr. Rivera controlled and operated Eclipse, as well as every paragraph discussing Mr. Rivera's involvement in the conspiracy, reiterates that he and his coconspirators were partners, "each equally involved in the activities required for the business to succeed." Every single paragraph in the PSI describing the offense conduct discusses the actions of the coconspirators working together—without any mention of one controlling or leading the conspiracy.

> 186. *Arencibia, Rivera, Alvarado* **and** *their co-conspirators engaged in prescription drug diversion. Arencibia, Rivera* **and** *their co-conspirators placed Eclipse in the name of Valdespino*. In reality, *Arencibia, Rivera* **and** *their co-conspirators also controlled and operated*.
>
> 187. Specifically, *Valdespino was the owner of Eclipse on paper. Valdespino purchased Eclipse, for his own use and benefit and for the use and benefit of Arencibia and Rivera. Valdespino, Arencibia, and Rivera maintained a wholesale drug distributor license for Eclipse. Eclipse, which sold diverted drugs to pharmacies throughout the United States.* These pharmacies then resold the diverted drugs to consumers throughout the United States and sometimes billed the drugs to health care benefit programs, including Medicare and Medicaid.
>
> 188. Eclipse obtained diverted HIV medications and then sold them to independent pharmacies. *Through Eclipse, members of the conspiracy, including Alvardo, Valdespino, Oria and others, sold medications* they knew were diverted to pharmacies which dispensed them to individuals, including Medicaid recipients.
>
> 191. *Rivera, Arencibia, Alvardo, Valdespino, Oria and others introduced these misbranded and diverted prescription drugs, including HIV medication, into interstate commerce by selling them, through Eclipse*, to various pharmacies at steep discounts, far below the pricing available when the drugs were sold through legitimate channels of distribution. These medications were required by law to include product-tracing information that identifies the product, the quantity, the lot number, strength and dosage, the date of each sale, and the parties to each transaction.

192. As Valdespino was aware, *Arencibia, Rivera, Alvardo, Oria and others acting on behalf of Eclipse either included falsified product tracing information to conceal the source of the diverted medication or failed to include it altogether*. These pharmacies then resold the diverted drugs to consumers throughout the United States and sometimes billed the drugs to health care benefit programs, including Medicare and Medicaid.

194. *Rivera, Arencibia, Alvardo, Valdespino, Oria and others carried out a scheme to traffic in medical products with false documentation* by knowingly distributing diverted prescription drugs with falsified paperwork designed to conceal the true origin of the drugs. The diverted medication was sold to pharmacies throughout the United States with falsified information in the T3s/pedigrees, which concealed the true origin of the diverted prescription drugs from Eclipse's customers and made it appear as though these drugs had been acquired legitimately through the regulated supply chain. Eclipse's pharmacy customers dispensed these diverted prescription drugs to unsuspecting patients and billed health care benefit programs for the drugs. Arencibia and Rivera were beneficial owners of Eclipse who paid funds to start the company and was involved in its operation and the laundering of the proceeds of the sale of diverted medication.

195. Eclipse's pharmacy customers dispensed these diverted prescription drugs to unsuspecting patients and billed health care benefit programs for the drugs, and *Alvardo was involved in this portion of the operation. Alvardo also facilitated the purchase of an existing pharmaceutical wholesaler, which he and his co-conspirators used to commit this offense. Alvardo was also involved in banking on behalf of the company and depositing the proceeds*. These medications were required by law to include product-tracing information that identifies the product, the quantity, the lot number, strength and dosage, the date of each sale, and the parties to each transaction. *Alvardo, Valdespino and others either included falsified product tracing information to conceal the source of the diverted medication or failed to include it altogether. Alvardo was responsible for, among other things, depositing the proceeds of the crime and assisting Valdespino with the sales and operations of Eclipse.*

196. Specifically, *Valdespino was responsible for laundering Eclipse's proceeds, as well as invoicing customers, and was the sole signatory on Eclipse's bank* accounts. Certain bank accounts used to execute the scheme and to launder the proceeds were opened in and are located in Miami. *Once Eclipse received payment for the diverted medication, Arencibia, Rivera* **and their co-conspirators** *directed Valdespino to take payment to bank branch locations to conduct transactions on behalf of Eclipse.* The proceeds were then eventually transferred from an Eclipse bank account to the Company 1 Account in order to transfer the illegal proceeds to cash and conceal its source. Valdespino transferred the proceeds from an Eclipse bank account to the bank account of Valdespino LLC, and then to Company l Account in order to transfer the illegal proceeds to cash and conceal its source.

199. Between in or around March 2022 and in or around December 2023, Eclipse, was paid a total of $21,540,489 by pharmacies throughout the United States for diverted prescription drugs.

200. On January 8, 2024, Valdespino was arrested for his involvement in the instant offense, and on January 25, 2024, Valdespino the Court ordered that the defendant be detained. On February 7, 2024, Valdespino was formally charged by way of an Indictment. On April 4, 2025, Arencibia and Rivera were charged by way of Information for their involvement in this fraud scheme. They were subsequently arrested on April 11, 2025, and later released on bond. No information has been provided by the government, indicating Valdespino, Arencibia, Rivera or co-conspirators made any post arrest statements.

## REQUEST FOR DOWNWARD DEPARTURE/VARIANCE

Mr. Rivera asserts that the above reasons taken individually or collectively provide sufficient reasons for a downward variance.

## CONCLUSION

**WHEREFORE**, for the reasons detailed herein, the Defendant, JOSE RIVERA, respectfully requests that this Court adopt the objections to the Presentence Investigation Report, calculate separate sentences for the two cases Case No. 19-cr-20674, level 22, criminal history category I and Case No. 25-cr-20154, level 23, criminal history category I with the sentences to run concurrent, and/or grant a variance as set forth in the arguments above, and grant such other relief the Court deems appropriate under the circumstances.

Mr. Rivera and Counsel thank this Court for considering his objections to the Presentence Investigation Report (PSI) and Sentencing Memorandum. Counsel will have further remarks at the time of sentencing.

Respectfully submitted,

**MICHAEL R. BAND P.A.**
*Attorney for Jose Rivera*

        1224 Alfred I. DuPont Building
        169 East Flagler Street
        Miami, Florida 33131
        Tel: 305.372.8500
        Email: michael@bandlawfirm.com

*/s/ Michael R. Band.*

Michael R. Band
Florida Bar No. 228338

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on September 30, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Michael R. Band*

Michael R. Band